UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN FANNING, COREEN KRAYSLER, MARTIN KAY, PAUL RISS, CECILIA LENK, AND NETCAPITAL INC.,<br><br>Defendants. | **Civil Action No. 26-13665**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against defendants John Fanning ("Fanning"), Coreen Kraysler ("Kraysler"), Martin Kay ("Kay"), Paul Riss ("Riss"), Cecilia Lenk ("Lenk"), and Netcapital Inc. ("Netcapital") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This action concerns a fraudulent scheme to overstate the revenue of Netcapital, a Massachusetts-based company with publicly traded common stock. From approximately October 2021 through January 2024 (the "Relevant Period"), Netcapital improperly recorded in its books and records (or "recognized") nearly $14 million in revenue from consulting agreements between Netcapital and supposed customers of Netcapital's services that were, in fact, controlled by Fanning. The consulting agreements, some of which were forged, were shams that produced no real revenue for Netcapital. The recognition of $14 million in claimed consulting revenue inflated Netcapital's Relevant Period revenue by approximately 345 percent. The inflated revenue was included or incorporated by reference in Netcapital's periodic and

other reports filed with the Commission and in securities offering materials aimed at investors. While Netcapital's revenue was fraudulently overstated, investors in Netcapital's public and private securities offerings invested over $25.6 million. Those investor funds allowed Netcapital to continue operating and facilitated payments to Fanning, Kraysler, Riss, Kay, Lenk, and others.

2.      The fraudulent scheme centered on two Netcapital subsidiaries. The first, Netcapital Funding Portal, Inc., operates an SEC-registered funding portal (the "Funding Portal") for small companies raising investor capital through Internet-based crowdfunding under Regulation Crowdfunding ("Reg. CF").

3.      Another Netcapital subsidiary, Netcapital Advisors, Inc. ("Netcapital Advisors"), claims to provide consulting services to companies seeking to conduct crowdfunding securities offerings on the Funding Portal, including strategic advice, guidance concerning capital formation, technology consulting, and digital marketing.

4.      Netcapital Advisors entered sham consulting agreements with at least eleven purported startup companies (the "Portfolio Companies") controlled by Fanning. The sham agreements between Netcapital Advisors and the Portfolio Companies, all of which were backdated, obliged each of the Portfolio Companies to pay Netcapital Advisors between $1 million and $2 million. In exchange, Netcapital Advisors purportedly agreed to provide, typically over a three- or four-month period, basic services in connection with the Portfolio Companies' anticipated Reg. CF securities offerings. Those basic services included creating logos, pitch decks, and websites; advising on business plans; and making investor introductions. Because the Portfolio Companies had no revenue or meaningful assets, they could pay Netcapital Advisors only in equity in the form of Portfolio Company membership units or stock. By contrast, other startups, not involved in the fraud, paid Netcapital Advisors an average of approximately $50,000 in cash (or a mixture of cash and equity) for similar services.

5.    After Netcapital Advisors supposedly rendered consulting services, the Portfolio Companies commenced Reg. CF securities offerings on the Funding Portal.  Numerous documents executed in connection with certain Portfolio Companies' Reg. CF securities offerings, including documents filed with the Commission and available to potential investors, were also forged.

6.    During the Relevant Period, Netcapital's revenue—disclosed to the securities markets in periodic and other reports filed with the Commission—derived principally from the fraudulent Portfolio Company consulting agreements.  Recognizing revenue from the Portfolio Company agreements was improper because, among other things, the agreements were shams rather than legitimate arrangements approved by parties committed to performing contractual obligations.

7.    During and after the Relevant Period, Netcapital conducted over a dozen public and private securities offerings that included or incorporated by reference financial statements containing the fraudulently overstated revenue.  Through those securities offerings, Netcapital raised millions of dollars from investors.

8.    Fanning was the common thread between Netcapital and the Portfolio Companies. During the Relevant Period, Fanning acted as a Netcapital officer and was involved in significant operational and strategic decisions, including Netcapital's efforts to raise capital.  At the same time, Fanning exercised control over the Portfolio Companies and owned significant amounts of their equity.  Rather than own the Portfolio Companies in his own name, Fanning owned them through intermediary companies that he also controlled ("Intermediary Companies").  The Portfolio Companies had titular managers, but in reality those individuals had no involvement with the companies, were unaware of the scope of their purported association with the companies, and/or acted subject to Fanning's direction.  Fanning knowingly engaged in and

3

directed deceptive acts in furtherance of the scheme, such as the forgery of consulting agreements and other Portfolio Company documents, the appointment of nominee Portfolio Company managers, and the use of the Intermediary Companies to obscure his involvement.

9.    Kraysler was Netcapital's Chief Financial Officer ("CFO") throughout the Relevant Period.  She reviewed, approved, and certified financial statements that included inflated revenue.  She was also one of Netcapital Advisors' key principals and had significant responsibility for overseeing the sham Portfolio Company consulting arrangements and providing the supposed consulting services.

10.    Riss, a certified public accountant ("CPA"), had substantial financial reporting responsibilities at Netcapital, including with respect to revenue recognition and preparation of Netcapital's financial statements.  Riss made entries in Netcapital's books and records for revenue attributed to the sham Portfolio Company consulting agreements and prepared financial statements that included inflated revenue.  He also served as the Funding Portal's Chief Compliance Officer ("CCO") and, in that role, had access to detailed information regarding the Portfolio Company securities offerings and helped to facilitate those offerings in furtherance of the scheme.

11.    Kay joined Netcapital's board of directors in May 2022 and was Netcapital's Chief Executive Officer ("CEO") for the portion of the Relevant Period beginning in January 2023.  As Netcapital CEO, Kay reviewed, approved, and certified financial statements that included inflated revenue.  During the first five fiscal quarters of Kay's tenure as Netcapital CEO, Netcapital overstated its revenue by around 436 percent.

12.    Lenk preceded Kay as Netcapital CEO and served as Netcapital Advisors' principal executive officer between the beginning of the Relevant Period and January 2023.  As Netcapital CEO, Lenk reviewed, approved, and certified financial statements that included

inflated revenue.  Lenk, at Kraysler's direction, signed numerous backdated Portfolio Company consulting agreements on behalf of Netcapital Advisors and allowed revenue to be recognized despite being in a position to know that consulting services had not been provided during the periods when Netcapital recognized the revenue.

13.    Fanning, Kraysler, Riss, and Kay knew of or recklessly ignored—and Lenk was negligent regarding—the fraudulent nature of the revenue derived from the Portfolio Company consulting agreements and Fanning's role with and influence over Netcapital and the Portfolio Companies.

## VIOLATIONS

14.    By virtue of the conduct alleged herein, Fanning violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) under the Exchange Act [17 C.F.R. §§ 240.10b-5(a) and (c)], and aided and abetted Netcapital's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Rule 10b-5(b) under the Exchange Act [17 C.F.R. § 240.10b-5(b)].

15.    By virtue of the conduct alleged herein, Kraysler violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5, 13a-14 [17 C.F.R. § 240.13a-14], and 13b2-2 [17 C.F.R. § 240.13b2-2] under the Exchange Act.

16.    By virtue of the conduct alleged herein, Kay violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5, 13a-14, and 13b2-2 under the Exchange Act.

17.    By virtue of the conduct alleged herein, Riss violated Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and

5

10b-5(c) under the Exchange Act, and aided and abetted Netcapital's violations of Section 17(a)(2) of the Securities Act and Rule 10b-5(b) under the Exchange Act.

18.    By virtue of the conduct alleged herein, Lenk violated Sections 17(a)(2) and 17(a)(3) of the Securities Act and Rule 13a-14 under the Exchange Act.

19.    By virtue of the conduct alleged herein, Netcapital violated Section 17(a) of the Securities Act, Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 10b-5, 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], and 13a-13 [17 C.F.R. § 240.13a-13] under the Exchange Act.

### NATURE OF THE PROCEEDING AND RELIEF SOUGHT

20.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

21.    The Commission seeks: (i) against all Defendants, permanent injunctions, prohibiting the Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (ii) against Fanning, Kraysler, Kay, Riss, and Netcapital, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, under Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)]; (iii) against all Defendants, civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) against Fanning, Kraysler, Kay, and Riss, orders barring them from acting as an officer or director of any public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (v) against Fanning, Kraysler, Kay, Riss, and Lenk, further permanent injunctive relief prohibiting each of them from directly or indirectly participating in the issuance, purchase,

offer, or sale of any security, provided, however, that such injunction shall not prevent any of them from purchasing or selling securities for his or her own account; (vi) against Fanning, Kraysler, Kay, and Riss, further permanent injunctive relief prohibiting each of them from, directly or indirectly, acting as or being associated with any broker or dealer; (vii) against Fanning, further permanent injunctive relief prohibiting him from directly or indirectly participating in the management of, or otherwise exercising any control or influence over, Netcapital, provided, however, that such injunction shall not prevent Fanning from voting, purchasing, or selling shares of Netcapital or its successors on his own behalf; (viii) against Riss, further permanent injunctive relief prohibiting him from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit; and (ix) such other and further relief the Court may deem just and proper.

## **DEFENDANTS**

22.     **Netcapital (f/k/a Valuesetters Inc.)** is a Utah corporation that was headquartered in Boston, Massachusetts throughout the Relevant Period.  Netcapital's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the Nasdaq Capital Market under the ticker NCPL.

23.     **Fanning**, age 62, is a resident of Hull, Massachusetts.  Fanning is the husband of Kraysler and, at all times relevant to this action, they shared a home in Hull, Massachusetts.

24.     **Kraysler**, age 62, is a resident of Hull, Massachusetts.  Kraysler is the CFO of Netcapital and has served in that role since September 2017.  Kraysler is the wife of Fanning and, at all times relevant to this action, they shared a home in Hull, Massachusetts.

25.     **Riss**, age 71, is a resident of White Plains, New York.  He has been a licensed CPA since 1980.  At all times relevant to this action, Riss had financial reporting responsibilities at Netcapital, including responsibility for preparing its financial statements and revenue recognition decisions.  He is the CCO of the Funding Portal.

26.     **Kay**, age 62, is a resident of Newton, Massachusetts.  Kay joined Netcapital's board of directors on May 15, 2022 and became Netcapital's CEO on January 3, 2023.  Kay resigned from his roles as a Netcapital director and its CEO on December 3, 2025.

27.     **Lenk**, age 71, is a resident of Watertown, Massachusetts.  Lenk served as Netcapital CEO between July 28, 2017 and January 3, 2023.  In January 2023, Lenk resigned as Netcapital's CEO and was named CEO of its subsidiary Netcapital Advisors, although she had executed documents using that title since at least 2020.  Lenk has been a member of Netcapital's board of directors since 2017 and is still Netcapital Advisors' CEO.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

29.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  A substantial portion of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts.  Netcapital is headquartered in Boston.  Fanning, Kraysler, Kay, and Lenk were residents of Massachusetts at all times relevant to this action.

30.     In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others,

made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails.

**THE FRAUDULENT SCHEME**

**A.    Background on the JOBS Act and Reg. CF**

31.    The fraudulent scheme involved the misuse of Internet-based crowdfunding, a novel capital formation mechanism designed to make it easier and less costly for startups and small businesses to raise money.  In 2012, the Jumpstart Our Business Startups Act ("JOBS Act") amended the Securities Act to exempt certain crowdfunding transactions from the registration provisions of the federal securities laws.  Reg. CF is an SEC-adopted regulation that implements the JOBS Act's crowdfunding exemption.  Under the JOBS Act and Reg. CF, eligible companies—typically smaller, early-stage companies—are allowed to raise capital using the Reg. CF exemption if they meet certain requirements.  Between May 16, 2016 (the effective date of Reg. CF) and December 31, 2024, thousands of issuers have sought to raise, in aggregate, up to $8.4 billion under Reg. CF.

32.    One requirement under Reg. CF is that each crowdfunding securities offering be conducted through an online platform operated by either a registered broker-dealer or a funding portal registered with the SEC and the Financial Industry Regulatory Authority ("FINRA").

33.    During the Relevant Period, the Funding Portal was a funding portal registered with the SEC and FINRA.

34.    Reg. CF includes various provisions governing the independence and conduct of entities like the Funding Portal.  For example, directors, officers, and partners of funding portals, or others who occupy a similar status or perform a similar function, cannot have a financial interest in a company raising money through the funding portal.  Funding portals must also deny companies access to their platform if the funding portal has a reasonable basis for believing that

9

the company or the securities offering presents the potential for fraud or otherwise raises concerns about investor protection.

35.     Reg. CF also includes requirements for companies that seek to raise capital through crowdfunding securities offerings.  For instance, companies must disclose the names of beneficial owners of 20 percent or more of their outstanding equity.  Companies must also disclose their finances.  The level of scrutiny applied to the financial information companies have to provide depends on the amount they seek to raise.  Companies raising $124,000 or less can self-certify financial statements—*i.e.*, the company's principal executive officer certifies that the financial statements are true and complete in all material respects.  Companies attempting to raise between $124,000 and $618,000 must provide financial statements reviewed by an independent public accountant.  Companies attempting to raise over $618,000 must generally provide financial statements audited by an independent public accountant, except that first-time issuers seeking to raise between $618,000 and $1,235,000 can also rely on reviewed (rather than audited) financial statements.

**B.     Fanning Acted as an Officer of Netcapital.**

36.     Fanning created the Netcapital brand as early as 1999 and has been associated with various Netcapital-branded business enterprises ever since.  He purported to be the "Chairman and CTO [Chief Technical Officer]" of Netcapital.com LLC, an entity that claimed to invest in and advise various portfolio companies.  He also was a founder of, and held an indirect interest in, Netcapital Systems LLC, which developed the technology used to operate, and until 2020 owned, the Funding Portal.

37.     The current iteration of Netcapital came into being in 2020, after a business combination between Valuesetters, Inc., a public company, and Netcapital Systems.  The Valuesetters transaction, whereby Valuesetters acquired the Funding Portal, closed in November

2020. Valuesetters subsequently changed its name to Netcapital Inc. As a result of the transaction, Netcapital Systems became Netcapital's majority shareholder.

38.    At various times before the Valuesetters transaction, Fanning's Intermediary Company Vaxstar LLC controlled between around 33 and 66 percent of Valuesetters' outstanding stock. For a time, Vaxstar also served as Valuesetters' and Netcapital's principal lender, with Netcapital's indebtedness to Vaxstar at one point reaching $1.4 million. After the 2020 Valuesetters transaction, Fanning continued to control sizeable portions of Netcapital stock through his indirect ownership interest in Netcapital Systems.

39.    In 2017, Fanning offered Lenk the role of Valuesetters CEO. After negotiating the terms of her employment with Fanning, Lenk accepted the role. A few months later, Kraysler joined Valuesetters as CFO after Fanning introduced her to Lenk. Lenk and Kraysler retained their respective roles as CEO and CFO at Netcapital after the 2020 transaction.

40.    After the Valuesetters transaction and during the Relevant Period, Fanning acted as an officer of Netcapital despite the company designating him as merely an "advisor."

41.    Fanning had an extensive role in Netcapital's business operations, its raising of capital, and its other financing efforts.

42.    Fanning had access to Netcapital's bank accounts.

43.    Fanning received a salary from Netcapital from at least March 2020 until at least September 2023, which was at times the same as or similar to the salaries of named officers such as Kraysler and Lenk.

44.    Fanning owned, through Intermediary Company Dotcom Capital LLC, the website domains for Netcapital, the Funding Portal, and Netcapital Advisors.

45.    Netcapital provided Fanning with indemnification rights like other officers.

46.     Fanning also had access to Netcapital's draft financial statements and information concerning regulatory inquiries and Netcapital's audits.

47.     Until at least April 2024, Fanning held himself out as Netcapital's "chairman."

48.     Fanning used the messaging application Signal to communicate regarding Netcapital business matters and insisted that others do so as well.  Signal is an end-to-end encrypted messaging application that includes additional privacy features such as allowing users to set timers for messages to disappear after being read.  Kraysler, Riss, Kay, and Lenk each used Signal to communicate with Fanning or others regarding Netcapital business.  Fanning failed to produce Netcapital-related Signal messages, or any other communications, to the Commission during its investigative proceeding in this matter, despite a Commission subpoena calling for him to do so.

49.     Before and during the Relevant Period, each of Kraysler, Riss, Kay, and Lenk had regular interactions with or involving Fanning regarding Netcapital business, operations, and strategy.  As a result of these interactions, which evidenced the degree of Fanning's involvement with Netcapital, each of Kraysler, Riss, and Kay knew of or recklessly disregarded—and Lenk was negligent regarding—the fact that Fanning acted as an officer of Netcapital.

50.     For instance, Kraysler communicated with Fanning, Riss, and others regarding potential strategic transactions involving Netcapital, including the 2020 transaction between Valuesetters and Netcapital Systems.  In some of those communications, Fanning described his progress in developing or negotiating potential transactions affecting Netcapital.

51.     Kraysler asked Fanning for, and Fanning provided, materials in connection with at least one audit of Netcapital's financial statements by Netcapital's external auditor.

52.     Kraysler communicated with Fanning, Riss, Lenk, and others regarding Netcapital's public relations strategy (including communications in which Fanning approved

Netcapital press releases) and capital raising efforts (including communications in which Fanning engaged directly with Netcapital's investment banker).

53.    Kraysler also knew that Netcapital continued to compensate Fanning after he ceased to be on Netcapital's payroll through a consulting arrangement with Intermediary Company Nantascot LLC.

54.    Lenk likewise was included in communications with Fanning regarding Netcapital's public relations strategy and capital raising and financing efforts, including communications in which Fanning acted on Netcapital's behalf.

55.    Lenk also communicated with Fanning regarding efforts to secure a loan for Netcapital under the Paycheck Protection Act program, and Fanning provided Lenk with log-in credentials to the website through which the loan was administered, which had been set up using a Valuesetters email account associated with Fanning.

56.    Lenk communicated with Fanning, Riss, and others regarding debt that Netcapital owed to Intermediary Company Vaxstar, which evidenced Fanning's involvement in ensuring that documents necessary to amend the terms of Netcapital's indebtedness to Vaxstar were executed.

57.    Lenk executed on Netcapital's behalf an indemnification agreement with Fanning.

58.    Riss consulted with Fanning regarding Netcapital's financial statements.  Fanning offered comments regarding the content of financial statements, including sources of revenue.

59.    Riss also discussed potential strategic transactions, capital raising and financing efforts, and other matters involving Netcapital with Fanning, Kraysler, Lenk, and others, which, as discussed above, included communications evidencing the degree of Fanning's involvement in those various efforts.

60.    Fanning provided Riss with materials in connection with Netcapital's audits.

13

61.    During Kay's tenure as Netcapital CEO, Kay understood that Fanning acted as a Netcapital executive, even though Fanning was not formally named an officer of the company.

62.    Kay knew Fanning was on Netcapital's payroll until September 2023, at which point Kay understood that Netcapital stopped paying Fanning a salary.  Kay then authorized a supposed consulting agreement between Netcapital and Intermediary Company Nantascot that Kay believed at the time was a means to continue paying Fanning.  In light of the information available to him as Netcapital CEO, Kay knew or was reckless in not knowing that Nantascot was an Intermediary Company that owned an interest in one of the Portfolio Companies.

63.    Kay also communicated with Fanning, Kraysler, Riss, and others regarding potential strategic transactions involving Netcapital, Netcapital's ability to issue stock to executives, capital raising and financing efforts, and other matters.

64.    Sometime in 2025, while Kay was aware of FINRA and SEC investigations relating to Netcapital, and while he was Netcapital's CEO, Kay deleted the Signal application from his mobile phone, thus losing any remaining messages stored within the application.  This included Kay's Signal communications with Fanning.

## C.    Fanning Controlled the Portfolio Companies.

65.    In addition to acting as an officer of Netcapital, Fanning controlled the Portfolio Companies from which Netcapital derived millions of dollars in inflated revenue.

66.    The Portfolio Companies were AceHedge LLC, CountSharp LLC, CupCrew LLC, Cust Corp., Dark LLC, Fantize LLC, HeadFarm LLC, NetWire LLC, RealWorld.net LLC, Reper LLC, and StockText LLC.

67.    Fanning determined the ownership structure of the Portfolio Companies.  He assigned significant—often majority—equity stakes to some or all of the Intermediary Companies, which he controlled.

68. The Intermediary Companies that Fanning used to control Portfolio Company equity, as well as for other purposes, included Astage LLC, Black Eagle Ventures LLC, Codelaw LLC, Dotcom Capital, Fanning LLC, Nantascot, Stallion Seed LLC, and Vaxstar.

69. The Intermediary Companies typically each controlled under 20 percent of any particular Portfolio Company's equity. This arrangement hid Fanning's involvement and was structured to circumvent the requirement that Reg. CF issuers disclose the beneficial owners of 20 percent or more of their equity. When the Intermediary Companies' interests in the Portfolio Companies were aggregated, however, the Intermediary Companies owned between 39 and 100 percent of the Portfolio Companies' outstanding equity.

70. Fanning also sometimes assigned Portfolio Company equity to the companies' purported managers or other personnel.

71. For instance, Fanning assigned an equity interest in Portfolio Company Dark to Dark's purported manager, Individual A. Individual A was unaware that Fanning had done so, or that Individual A was designated as an owner of Dark.

72. In another instance, Fanning assigned an equity interest in Portfolio Company RealWorld to RealWorld's purported manager, Individual B. Individual B also was unaware that Fanning had done so, or that Individual B was designated as an owner of RealWorld.

73. Fanning was the person behind the Portfolio Companies in other ways.

74. Fanning created the purported business purposes for the Portfolio Companies and prepared their business materials.

75. Fanning selected management for the Portfolio Companies. For some Portfolio Companies, Fanning named people as managers without telling those people about their role or the scope of their role. In all cases, however, Fanning exercised ultimate authority over the

Portfolio Companies.  One individual who agreed to act as manager of Portfolio Company CountSharp, Individual C, deferred to Fanning for key management decisions.

76.     Fanning controlled the Portfolio Companies' trade names, trademarks, and websites.

77.     Fanning had access to Portfolio Company bank accounts.

78.     Fanning dictated the terms of contractual arrangements for Portfolio Companies.

79.     Fanning controlled the Portfolio Companies' email platforms and their purported managers' email accounts.

**D.     Kraysler, Riss, and Kay Were Aware of, and Lenk Should Have Been Aware of, Fanning's Control of the Portfolio Companies.**

80.     Each of Kraysler, Kay, and Riss knew of or recklessly ignored Fanning's control of the Portfolio Companies, from which Netcapital derived its inflated revenue.

81.     Lenk was negligent regarding Fanning's control of the Portfolio Companies.

82.     The capitalization tables for the Portfolio Companies show that at least four Intermediary Companies owned interests in each Portfolio Company: (i) Codelaw, Dotcom Capital, Fanning LLC, and Stallion Seed owned interests in all eleven Portfolio Companies; (ii) Black Eagle Ventures owned interests in eight Portfolio Companies; (iii) Vaxstar owned interests in seven Portfolio Companies; (iv) AStage owned interests in five Portfolio Companies; and (v) Nantascot owned an interest in one Portfolio Company.

83.     Kraysler received capitalization tables for the Portfolio Companies.

84.     Kraysler also knew or recklessly ignored that Fanning allocated ownership of Portfolio Company equity among Intermediary Companies.

16

85.     For instance, on May 3, 2022, a Netcapital employee emailed Fanning and Kraysler to confirm the ownership of Portfolio Company NetWire.  Rather than reach out to NetWire's purported management, Kraysler contacted Fanning for the information.

86.     Six months later, on November 9, 2022, Kraysler emailed to Fanning a capitalization table showing the allocation of ownership of NetWire equity among various entities.  Among the listed owners of NetWire were Intermediary Companies AStage, Codelaw, Dotcom Capital, Fanning LLC, and Stallion Seed, each of which was listed as owning between 12 and 18 percent of NetWire.

87.     Kraysler also knew or recklessly ignored that Fanning exercised control over at least some of the Intermediary Companies that owned interests in the Portfolio Companies.

88.     For instance, in November 2020, Fanning sent an email, copying Kraysler and Lenk, regarding a contract involving Intermediary Company Dotcom Capital, writing "I would prefer it say Dotcom Capital LLC or its assigns rather than my name if possible."

89.     On another occasion, in February 2021, a Netcapital employee emailed Kraysler to ask whether she should create a website for Intermediary Company AStage, which the employee indicated was a "project from John [Fanning]."  Kraysler responded that she would talk to Fanning and, twenty minutes later, instructed the Netcapital employee to "proceed," writing that "this is an important part of our strategy."

90.     In July 2022, Fanning emailed Kraysler wire instructions for Intermediary Company Vaxstar, to which Netcapital then owed approximately $1,400,000.  Kraysler then directed Lenk to wire $1,000,000 to Vaxstar to pay a portion of Netcapital's debt.  Kraysler does not appear to have communicated around this time with anyone besides Fanning who purported to represent or could have represented Vaxstar.

17

91.     Fanning, rather than the Portfolio Companies' supposed managers, emailed Kraysler materials describing the Portfolio Companies' purported businesses, including a presentation in which Fanning was identified as a founder of Portfolio Company Reper.  In some instances, the content that Fanning provided to Kraysler was included, with minor revisions, on the Portfolio Companies' Funding Portal offering pages.

92.     Fanning also sent Kraysler proposed content for the Portfolio Companies' websites, and she received an email from a Netcapital contractor indicating that the content Fanning provided was added to at least one Portfolio Company's website.

93.     Kraysler was informed that Fanning was involved in the Portfolio Companies' personnel matters.  In May 2023, Fanning forwarded to Kraysler an email from a Netcapital contractor that included a list of "[p]rofiles we used."  The list of "profiles" included individuals that were identified as serving in technology roles for some of the Portfolio Companies. Kraysler also communicated with Fanning regarding Portfolio Company contractual arrangements, at one point telling Kay that she would speak with Fanning about adjusting the terms of a proposed agreement between Netcapital and Portfolio Company HeadFarm.

94.     Riss knew or recklessly ignored that Fanning, not the individuals listed as managers, controlled the Portfolio Companies.  Riss discussed Portfolio Company business matters with Fanning, instead of with the Portfolio Companies' purported managers, including the execution of Portfolio Company documents, valuation, and personnel matters.

95.     For instance, on October 30, 2023, Riss asked Fanning via Signal about the "price per share" for Portfolio Companies AceHedge and Fantize.  Riss reminded Fanning that Netcapital would get a 19 percent stake in those Portfolio Companies.  Fanning said that Riss would "have to do the math," using Netcapital's ownership stake as a baseline, and instructed

Riss to make Netcapital's stake in one of the Portfolio Companies 18 percent rather than 19 percent. Fanning then approved Riss's valuation calculation.

96. Riss knew that Fanning was involved in providing information on behalf of the Portfolio Companies in connection with Netcapital's audits, including at least one instance in which Fanning executed an investment confirmation on behalf of Portfolio Company Fantize that purported to confirm Netcapital's ownership of Fantize equity.

97. Riss had access to the Portfolio Companies' capitalization tables and reviewed at least some of them. Riss received at least one Portfolio Company's capitalization table directly from Fanning.

98. Riss knew or recklessly ignored that Fanning allocated ownership interests among Intermediary Companies, and that Fanning exercised control over those Intermediary Companies.

99. For example, on May 11, 2021, Riss sent Fanning tax forms for the Intermediary Companies Codelaw and Dotcom Capital and asked Fanning to distribute the forms "as appropriate."

100. On March 25, 2022, Riss sent Fanning a Signal message regarding Codelaw and Dotcom Capital, writing "Codelaw needs to assign membership units" in Netcapital Systems "to someone to stay under 25%. Should it be Dotcom?" Fanning replied, "Sure."

101. Riss was also aware, though communications with other Netcapital personnel, that Fanning was involved in decisions regarding Codelaw's payroll.

102. On May 19, 2023, Fanning sent Riss a Signal message attaching a draft letter on the letterhead of Intermediary Company Vaxstar. The letter included Fanning's contact information and identified Riss as Vaxstar's Treasurer.

103.   On February 23, 2024, Riss received a document from a third party indicating that Fanning was the point of contact for Intermediary Companies Fanning LLC and Dotcom Capital and had authority to act on behalf of those entities.

104.   Kay knew of or recklessly ignored that Fanning controlled the Portfolio Companies, from which Netcapital derived substantial revenue during Kay's tenure as CEO.

105.   Kay understood that Fanning's principal responsibilities at Netcapital involved the Portfolio Companies.

106.   Kay knew that Fanning served as an "advisor" to various Portfolio Companies. Kay knew that despite having the nominal title "advisor" at Netcapital, Fanning acted as a Netcapital executive.

107.   Kay also knew or recklessly ignored that Fanning was associated with at least some of the Intermediary Companies, and that the Intermediary Companies owned interests in the Portfolio Companies.

108.   For example, on February 2, 2024, Kay and Riss exchanged emails, copying Kraysler, regarding an invoice from Intermediary Company Nantascot.  Riss wrote, "I have no idea what this invoice is for . . . . What consulting is being done by Nantascot?"  Kay responded, "its [sic] my understanding that this is how we have been compensating John [Fanning] for his time since he dropped from the payroll last year."

109.   Kay also discussed Portfolio Company personnel matters with Fanning and was aware of Fanning's efforts to secure financing for at least one Portfolio Company from Netcapital.

110.   Lenk was aware of Fanning's affiliation with Intermediary Companies that owned Portfolio Company equity.

20

111.    For example, at Fanning's request, Lenk served for a time as CEO of Intermediary Company Vaxstar.

112.    Lenk was negligent regarding the Intermediary Companies' ownership of Portfolio Company equity.

113.    Lenk was also aware that Fanning was involved with seeking financing for at least one Portfolio Company from Netcapital.  On August 1, 2023, Lenk sent Kay a text message regarding a $20,000 loan that Netcapital made to Portfolio Company HeadFarm and a $25,000 loan that it made to another entity.  Lenk told Kay that Fanning was "looking for the funds," and that Kraysler had approved the loans.  Kay then asked Lenk to confirm the amounts Netcapital would send to both entities, which Lenk did.

**E.    Netcapital Advisors Entered Fake Consulting Agreements With the Portfolio Companies.**

114.    Netcapital Advisors entered agreements with each of the Portfolio Companies, purportedly to provide consulting services for the Portfolio Companies' anticipated Reg. CF securities offerings on the Funding Portal.

115.    As described below, however, Netcapital improperly recognized revenue from the Portfolio Company consulting agreements because the agreements were shams contrived to inflate Netcapital's revenue.

116.    Netcapital Advisors' consulting agreements with the Portfolio Companies provided that Netcapital Advisors would assist with creating business logos, pitch decks, and websites, that Netcapital Advisors would advise on business plans, and that it would make investor introductions, among other basic tasks.

117.    In exchange, the Portfolio Companies each agreed to pay Netcapital Advisors between $1 million and $2 million.

21

118.   Because the Portfolio Companies each lacked revenue or meaningful assets, they could pay Netcapital Advisors only in equity in the form of Portfolio Company membership units or stock.

119.   By contrast, when Netcapital Advisors provided its consulting services to unrelated startups, rather than the Portfolio Companies, it charged an average of about $50,000 in cash (or a mixture of cash and equity) for similar services.

120.   Kraysler and Lenk had primary responsibility for Netcapital Advisors entering into the consulting agreements with Portfolio Companies.  Kraysler provided the Portfolio Company consulting agreements to Lenk, who signed them for Netcapital Advisors and sent them to the purported Portfolio Company managers for signature.

121.   Documents associated with the Portfolio Companies, including the consulting agreements, were predominantly signed using DocuSign, which is an online service for individuals to affix an electronic signature to legal and other documents.

122.   When a document is signed using DocuSign, DocuSign creates a receipt that reflects, among other things, the email addresses of the document's sender, recipients, and signatories; the date and time that the document was sent for signature, viewed, and signed; and the Internet Protocol ("IP") address that was used to send and sign the document.

123.   An IP address is a value made up of assigned numbers that identify how a particular computer or device accesses a computer network, such as the Internet.  Every computer or device attached to a computer network requires an IP address to connect to other networked computers.  It is generally possible to find the geographic location associated with an IP address.

124.    At least four of the purported consulting agreements between Netcapital Advisors and the Portfolio Companies were forged: those of Portfolio Companies CupCrew, HeadFarm, RealWorld, and CountSharp.

125.    The nominal manager of CupCrew, Individual D, owned an HVAC company and performed work at Fanning and Kraysler's home (the "Fanning-Kraysler Residence"). Individual D had no real involvement with CupCrew. His electronic signature appears on CupCrew's consulting agreement with Netcapital Advisors, but he did not sign it or authorize anyone to sign it on his behalf.

126.    RealWorld's nominal manager, Individual B, was a nephew of Fanning who lived in Florida and was located there when he purportedly signed RealWorld's consulting agreement with Netcapital Advisors on February 7, 2023. However, data associated with Individual B's electronic signature shows that it was applied using a mobile device from a location in New Hampshire. Individual B was not aware of and did not sign RealWorld's consulting agreement with Netcapital Advisors.

127.    CountSharp's manager, Individual C, also lived in Florida and was located there when he purportedly electronically signed CountSharp's consulting agreement with Netcapital Advisors on February 8, 2023. However, CountSharp's consulting agreement was electronically signed using a mobile device from the same location in New Hampshire as RealWorld's consulting agreement. Individual C was not made aware of CountSharp's consulting agreement with Netcapital Advisors before his signature was applied to it, and he did not sign the agreement.

128.    The person who electronically signed HeadFarm's consulting agreement with Netcapital Advisors, Individual E, lived in Colombia and appears to have been located there when she purportedly signed the agreement on February 7, 2023. However, her electronic

23

signature was applied to the HeadFarm consulting agreement using a mobile device from the same location in New Hampshire as the electronic signatures in RealWorld's and CountSharp's consulting agreements. There is no indication that Individual E was in New Hampshire when her purported signature was applied to the HeadFarm consulting agreement. Accordingly, all indications are that Individual E did not sign HeadFarm's consulting agreement with Netcapital Advisors.

129. As the sender of the HeadFarm, RealWorld, and CountSharp consulting agreements, Lenk had access to data associated with the signatures and was negligent in not knowing that they were executed from a single location in New Hampshire even though the supposed signatories lived and were located elsewhere. Lenk also knew that the consulting agreements were executed after the effective dates set forth in the agreements.

130. All the Portfolio Company consulting agreements were backdated—i.e., they were executed after their supposed effective date—sometimes across fiscal quarters.

131. Further, several of the Portfolio Companies had been recycled as businesses over time and did not need at least some of the services Netcapital Advisors supposedly agreed to provide.

132. For example, Netcapital's predecessor Valuesetters disclosed in September 2017 that it had "acquired an equity interest in . . . [Portfolio Company] Reper . . . in exchange for consulting services." That disclosure was subsequently removed from Valuesetters' and Netcapital's filings. Then, in an agreement with an effective date of August 15, 2021, Reper supposedly agreed to pay Netcapital Advisors $1.2 million for services including website design. Reper had a website for years before retaining Netcapital Advisors, and the website did not change after Netcapital Advisors was hired.

133.    Similarly, Portfolio Company NetWire was identified as a portfolio company of Fanning's first Netcapital venture as early as October 2000 and has had the same website and logo from at least 2010 through May 2025.  NetWire nevertheless purportedly agreed in an agreement with an effective date of February 1, 2022 to pay Netcapital Advisors $1.3 million for a package of six services including logo design and website development.  As of May 2025, NetWire's website and logo were unchanged from what had been in place for the preceding 15 years.

134.    Whether forged or not, all the consulting agreements were the product of Fanning's control over the Portfolio Companies, rather than a genuine desire by Portfolio Company managers to seek Netcapital Advisors' services.  The agreements were non-negotiable, and Fanning presented them to potential managers on a take-it-or-leave-it basis—either they could accept the agreement or forgo the position.

135.    Fanning also pressured individuals to serve as nominee managers and execute agreements.  For instance, Fanning coerced Individual E, who had previously signed HeadFarm's consulting agreement with Netcapital Advisors and at the time worked as a contract paralegal for Intermediary Company Codelaw, into serving as the manager of Portfolio Company Fantize.  Fanning told Individual E to sign Fantize's consulting agreement with Netcapital Advisors, indicating that this was expected of her as part of her employment.

136.    Netcapital Advisors ultimately provided little, if any, meaningful consulting services to the Portfolio Companies in exchange for the millions of dollars in equity compensation the Portfolio Companies supposedly agreed to provide.

**F.     The Portfolio Companies' Reg. CF Securities Offerings Were in Furtherance of the Scheme.**

137.    After Netcapital Advisors supposedly rendered the services described in the consulting agreements, the Portfolio Companies commenced Reg. CF securities offerings on the Funding Portal.  The securities offerings, some of which were themselves the product of forgery, were undertaken in furtherance of the scheme.  In particular, the securities offerings enabled Netcapital to assign a value to the Portfolio Company equity that it supposedly received for Netcapital Advisors' consulting services.

138.    Fanning, Kraysler, and Riss directed the Portfolio Companies' Reg. CF securities offerings.

139.    On February 16, 2023, Riss wrote to Kraysler that Portfolio Company Dark "has to be a priority" because "[w]e need to launch [it] so we can value the stock."  Later that day, Dark's Reg. CF securities offering documents and related materials were electronically signed in the name of Dark's purported manager, Individual A.  The data associated with the signed documents shows that Kraysler sent the documents to Individual A from, and Individual A's signature was electronically applied at, the Fanning-Kraysler Residence.  However, Individual A lived in North Carolina and was not in Massachusetts when the documents were executed in his name.  Further, Individual A had previously said in an email, copying Kraysler, that he was "not the CEO or anything of Dark LLC and can't sign on its behalf."  Dark commenced its Reg. CF securities offering on the Funding Portal on February 17, 2023.

140.    Similarly, on June 5, 2023, Riss informed Fanning via Signal message that managers for Portfolio Companies CupCrew, HeadFarm, and RealWorld needed to execute financial statement certifications for Reg. CF securities offerings because "[w]e need to see these stocks trading at 41 cents."  Within ten minutes of Riss writing to Fanning on June 5, 2023, the

financial certifications were executed in the names of the purported managers of CupCrew, HeadFarm, and RealWorld at the Fanning-Kraysler Residence.  Just over twenty minutes after Riss asked for the signed documents—from purportedly separate Portfolio Companies with purported managers located around the country—Fanning told Riss, "they are all signed." CupCrew, HeadFarm, and RealWorld commenced their Reg. CF securities offerings on the Funding Portal between June 9 and 14, 2023.

141.    These were not the only forgeries of materials connected to the Portfolio Companies' Reg. CF securities offerings and other contractual arrangements.  Between December 2022 and August 2024, the Fanning-Kraysler Residence was the signing location for several dozen documents purportedly signed by seven different nominal Portfolio Company managers, at least five of whom did not live in Massachusetts.  The forged documents included Portfolio Company operating agreements, capitalization tables, and other corporate documents; SEC filings; forms authorizing the Funding Portal to commence Reg. CF securities offerings; and investment confirmations provided to Netcapital's auditor.

142.    In addition to seeking the signatures of purported Portfolio Company managers, Riss facilitated the Portfolio Companies' Reg. CF securities offerings in other ways.  For instance, Riss at times directed a Netcapital contractor to prepare, and reviewed, financial statements for the Portfolio Companies that were filed with the Commission in connection with their Reg. CF securities offerings.

143.    Fanning and Kraysler worked from their home during the Relevant Period.  They conducted personal and professional business—e.g., executing documents, accessing their email accounts, and other tasks—using the IP address associated with the Fanning-Kraysler Residence that was used to execute documents in the names of Portfolio Company managers.

144.    Fanning and/or Kraysler executed documents on behalf of Portfolio Company managers without their knowledge or consent, or they directed others at their home to do so.

145.    In addition to potentially forging documents himself, or directing that it be done, Fanning also controlled the Portfolio Companies and knew of or recklessly disregarded forgery, including because at least one of the individuals whose signature was used without her consent confronted Fanning about the issue.

146.    In addition to potentially forging documents herself, or directing that it be done, Kraysler knew of or recklessly ignored the forgery of numerous documents in the names of the Portfolio Companies' purported managers.

147.    Kraysler oversaw the purported consulting arrangements with the Portfolio Companies.

148.    Kraysler also sent several of the documents that were forged and had access to information showing that the documents were sent from and supposedly executed at the Fanning-Kraysler Residence, sometimes within a matter of minutes.

149.    Riss knew of or recklessly ignored the forgery of documents in the names of the Portfolio Companies' purported managers.

150.    Riss knew, based on various conversations with Fanning, including in at least June 2023 and July and August 2024, that Fanning either signed Portfolio Company documents himself or had sufficient influence over the Portfolio Companies' purported managers to quickly procure their signatures.

151.    Riss also knew of or recklessly ignored Fanning's involvement in the improper use of DocuSign to execute documents in the names of others because, among other things, Riss personally engaged in that conduct at Fanning's direction.  On November 23, 2022, Riss emailed Fanning asking for the contact information of the purported manager of Intermediary Company

Nantascot in connection with a transaction involving Netcapital, Nantascot, and another entity that was supposed to close that month. Fanning provided the purported manager's Nantascot email address and told Riss to "use docusign." One week later, Riss accessed the Nantascot email account associated with the purported manager and used DocuSign to execute in the purported manager's name an agreement related to the transaction about which Riss had emailed Fanning on November 23, 2022.

152.    Kay and Lenk, like other Netcapital employees, had access to data associated with the purported Portfolio Company managers' signatures showing that numerous, seemingly unrelated individuals located around the country had supposedly signed numerous documents from a single location. Given their roles at Netcapital and the significance of the Portfolio Company consulting agreements to Netcapital's revenue, Kay knew of or recklessly ignored— and Lenk was negligent regarding—the forgery of documents in furtherance of the Portfolio Companies' Reg. CF securities offerings.

153.    Even in instances when the Portfolio Companies' Reg. CF securities offerings were not the product of fraud, they were controlled by Fanning. For instance, CountSharp's manager, Individual C, signed documents for its Reg. CF securities offering but did not determine whether CountSharp would conduct such an offering. That decision had already been made—by Fanning.

154.    The Portfolio Companies' Reg. CF securities offerings were structured to facilitate the scheme in various ways.

155.    For example, the Portfolio Companies uniformly sought to raise $124,000 or below. The Portfolio Companies therefore could self-certify their financials rather than having to have them reviewed or audited by an independent public accountant. This ensured that the Portfolio Companies and, by extension, Netcapital, avoided third-party scrutiny that might have

29

revealed forgeries, the lack of involvement by the Portfolio Companies' purported managers, and other issues.

156. In addition, the equity valuations in the Portfolio Companies' Reg. CF securities offerings were set at amounts that would purportedly support the exorbitant consulting revenue that Netcapital recognized.

**G.   Netcapital Fraudulently Recognized Revenue from Portfolio Companies.**

157. Netcapital reports revenue on a quarterly and annual basis, and its fiscal calendar uses quarters ending July 31, October 31, January 31, and April 30. Netcapital's fiscal year ends on April 30 of each calendar year.

158. Over ten consecutive fiscal quarters—between the quarter ending October 31, 2021 and the quarter ending January 31, 2024—Netcapital improperly recognized a total of approximately $13.9 million in consulting revenue from the Portfolio Companies. That $13.9 million made up approximately 77 percent of Netcapital's total reported revenue of $17.95 million over that period. In other words, Netcapital overstated its revenue during the Relevant Period by 345 percent.

159. That overstated revenue was reported in quarterly and annual filings for reporting periods between the quarter ending October 31, 2021 and the fiscal year ending April 30, 2024.

160. Overstated revenue recognized during the fiscal year ending April 30, 2024 was also included in quarterly and annual filings in the fiscal year ending April 30, 2025, although Netcapital did not recognize any new Portfolio Company consulting revenue during the fiscal year ending April 30, 2025.

161. Netcapital's recognition of revenue from the purported Portfolio Company consulting agreements did not comply with generally accepted accounting principles ("GAAP"),

which, as Netcapital disclosed to the investing public, applied to its preparation of its financial statements.

162.    GAAP is a series of authoritative standards (set out by policy boards, including the Financial Accounting Standards Board) that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.  This makes it easier for investors to analyze and extract useful information across different companies.

163.    Under GAAP, a company cannot recognize revenue from a contract with a customer unless the parties to the contract have approved it and are committed to perform their respective obligations.

164.    Netcapital instead recognized revenue from sham agreements with the Portfolio Companies that could not form the basis for the revenue Netcapital recognized, including at least four contracts that were forged.

165.    In addition, Netcapital's recognition of revenue from purported Portfolio Company consulting agreements did not comply with GAAP's requirement to recognize revenue in periods when services under the contract were performed.  Netcapital instead recognized revenue during periods in which no services were performed, because agreements were backdated and/or because Netcapital Advisors never provided services under the contract.

166.    Specifically, Netcapital recognized revenue beginning with the effective date printed on the Portfolio Company consulting agreements in instances when the agreements were not created or signed until later, sometimes several months after the effective date:

      a.    Netcapital recognized $502,174 in revenue from Reper's consulting agreement in the quarter ending October 31, 2021, even though the agreement was not created until December 1, 2021.

31

b. Netcapital recognized $400,000 in revenue from Cust Corp.'s consulting agreement in the quarter ending October 31, 2021, even though the agreement was not executed until November 24, 2021.

c. Netcapital recognized $975,000 in revenue from NetWire's consulting agreement in the quarter ending April 30, 2022, even though the agreement was not executed until April 28, 2022, two days before the end of the quarter.

d. Netcapital recognized $700,000 in revenue from Dark's consulting agreement in the quarter ending July 31, 2022, even though the agreement was not executed until August 13, 2022.

e. Netcapital recognized $780,000 in revenue from CupCrew's consulting agreement in the quarter ending January 31, 2023, even though the agreement was not executed until February 6, 2023.

f. Netcapital recognized $390,000 in revenue from HeadFarm's consulting agreement in the quarter ending January 31, 2023, even though the agreement was not executed until February 7, 2023.

g. Netcapital recognized $780,000 in revenue from CountSharp's consulting agreement in the quarter ending January 31, 2023, even though the agreement was not executed until February 8, 2023.

h. Netcapital recognized $555,000 in revenue from AceHedge's consulting agreement in the quarter ending July 31, 2023, even though the agreement was not executed until August 21, 2023.

i. Netcapital recognized $555,000 in revenue from Fantize's consulting agreement in the quarter ending July 31, 2023, even though the agreement was not executed until August 24, 2023.

32

j. Netcapital recognized $406,667 in revenue from StockText's consulting agreement in the quarter ending October 31, 2023, even though the agreement was not executed until November 2, 2023.

167. Netcapital's use of backdated consulting agreements meant that it fraudulently reported revenue from consulting agreements during quarters when those agreements did not exist. That was the case with the Reper, Cust Corp., Dark, CountSharp, CupCrew, HeadFarm, AceHedge, Fantize, and StockText consulting agreements. In all, approximately $5.1 million of the $13.9 million in Portfolio Company consulting revenue that Netcapital recognized—or around 37 percent—was recognized in periods in which no consulting agreement yet existed.

168. As a result, Netcapital also recognized revenue from consulting agreements during periods when Netcapital Advisors provided no consulting services. It was improper for Netcapital to recognize revenue for services that had not been provided.

169. Netcapital's recognition of revenue in quarters when Netcapital Advisors did not provide consulting services under applicable agreements was also contrary to Netcapital's representations to the public in SEC filings that its revenue was "recognized when performance obligations are satisfied."

170. Riss, a licensed CPA with decades of experience, was the person at Netcapital principally responsible for the revenue recognition process, including making journal entries for the revenue attributed to the Portfolio Company consulting arrangements. Riss prepared Netcapital's financial statements and Forms 10-Q and 10-K for each reporting period between the quarter ending October 31, 2021 and the fiscal year ending April 30, 2024.

171. As noted, Riss consulted Fanning regarding Netcapital's revenue, and Fanning offered suggestions about potential sources for revenue, including identifying for Riss several entities that would later become Portfolio Companies.

172. Kraysler was Netcapital's principal financial officer during the Relevant Period. She is knowledgeable about GAAP standards applicable to revenue recognition and Netcapital's revenue recognition policy. Kraysler approved overstated final revenue amounts in Netcapital's quarterly and annual filings, and signed all such filings, for each reporting period between the quarter ending October 31, 2021 and the fiscal year ending April 30, 2024.

173. Kraysler oversaw Riss's work on revenue recognition. Kraysler reviewed financial statements and notes to financial statements that Riss prepared. Kraysler and Riss also discussed Netcapital's financial statements, including its revenue, on a quarterly basis.

174. Kraysler provided information relevant to the revenue recognition process, such as executed consulting agreements.

175. Kraysler also told Riss how much revenue to book in particular quarters for at least some of the Portfolio Company consulting agreements. For example, on April 28, 2022, Kraysler sent Riss a Signal message to inform him that she "added an additional contract to the Netcapital Advisors fourth quarter contract file . . . It represents $975,000 in revenue for the fourth quarter. . . for [Portfolio Company] NetWire." The Netwire consulting agreement is dated February 1, 2022 but was not executed until the day Kraysler communicated with Riss, April 28, 2022. Kraysler did not tell Riss what services, if any, had been provided to support recognizing so much revenue from NetWire's consulting agreement. Nor did Riss ask for that information. All indications are that Netcapital Advisors provided no consulting services to Netwire before April 28, 2022.

176. Kraysler, who provided at least some of the Portfolio Company consulting agreements to Lenk for signature, knew or recklessly disregarded that they were backdated. Kraysler was also one of Netcapital Advisors' principals and, in that role, knew or recklessly disregarded that Netcapital Advisors was not providing services to the Portfolio Companies

34

commensurate with the revenue it was recognizing. Indeed, in many instances, Kraysler does not appear to have ever communicated with the purported managers of the Portfolio Companies.

177. Kay was Netcapital's principal executive officer between January 3, 2023 and December 2025. In that role, he signed quarterly and annual filings that overstated Netcapital's revenue for each reporting period between the quarter ending January 31, 2023 and the fiscal year ending April 30, 2024.

178. During the first five fiscal quarters of Kay's CEO tenure—from the quarter ending January 31, 2023 to the quarter ending January 31, 2024—approximately 81 percent of Netcapital's revenue ($8.12 million out of a total $9.98 million) was based on fraudulent Portfolio Company consulting agreements with Netcapital Advisors. During that period, Netcapital overstated revenue by 436 percent.

179. Despite that proportion of purported revenue attributable to the Portfolio Companies, Kay was unfamiliar with the Portfolio Companies and their purported managers, had no direct contact with them, and did not understand their businesses or know other basic information about them.

180. Lenk was Netcapital's principal executive officer from the beginning of the Relevant Period until January 3, 2023. In that role, she signed quarterly and annual filings that overstated Netcapital's revenue for each reporting period between the quarter ending October 31, 2021 and the quarter ending October 31, 2023.

181. Kraysler provided Portfolio Company consulting agreements to Lenk for signature. Lenk signed them without questioning why they were dated earlier or whether Netcapital Advisors provided services during the period reflected in the agreements for purposes of recognizing revenue.

35

182.    Kraysler and Kay executed management representation letters provided to Netcapital's auditor, which "confirm" in relevant part some or all of the following: (a) Netcapital's financials conform with GAAP; (b) the signers did not know of or suspect fraud; (c) revenue from customer contracts was appropriately accounted for under standards governing recognition of revenue from contracts with customers; (d) revenue-generating contracts were approved by appropriate parties; and (e) related-party relationships and transactions were properly accounted for and adequately disclosed in Netcapital's financial statements.

183.    Kraysler and Kay knew of or recklessly disregarded the falsity of the management representation letters.

184.    Fanning, Kraysler, Riss, and Kay knew or recklessly ignored that Netcapital was improperly recognizing revenue from sham Portfolio Company consulting agreements, including in periods in which no agreements existed and no services were performed.

185.    Lenk negligently allowed Netcapital to improperly recognize revenue from sham Portfolio Company consulting agreements, including in periods in which no agreements existed and no services were performed.

**H.    Netcapital Recognized Revenue from HeadFarm Despite its Purported Manager Disclaiming Involvement.**

186.    Fanning formed HeadFarm as a limited liability company in Delaware in 2010. According to HeadFarm's statement of organization, its managing member was Netcapital.com LLC, an entity for which Fanning claimed to serve as "Chairman and CTO [Chief Technical Officer]."

187.    Fanning was involved in discussions regarding the development of HeadFarm's website as early as August 2011.

188.    Fanning has controlled the domain for HeadFarm's website through Intermediary Company Dotcom Capital since at least 2013.

189.    Fanning has also paid taxes and fees associated with maintaining HeadFarm's registration in Delaware and referred to HeadFarm in an email to HeadFarm's Delaware registered agent as among "the companies I have set up."

190.    Netcapital Advisors purported to enter into a consulting agreement with HeadFarm as of January 1, 2023.  However, the agreement was not fully executed until February 7, 2023.  Lenk signed the agreement on Netcapital Advisors' behalf.

191.    As noted above, the person who signed HeadFarm's consulting agreement as manager, Individual E, lived in Colombia and is not known to have traveled to the United States during the Relevant Period.  But her signature was applied to the agreement from a location in New Hampshire at which other Portfolio Company consulting agreements were signed around the same time.

192.    The HeadFarm email account associated with Individual E was created on February 6, 2023.  As of February 2025, Individual E's HeadFarm email account had not been accessed since February 7, 2023.

193.    In other words, Individual E's HeadFarm email account appears to have been used for one purpose only: to execute HeadFarm's consulting agreement with Netcapital Advisors.

194.    Despite being identified as HeadFarm's manager on the consulting agreement, Individual E was not listed as a manager in HeadFarm's securities offering materials or any other documents.

195.    On February 9, 2023, Lenk emailed Kay that "we have several new portfolio companies in the works: HeadFarm, CountSharp, CupCrew, RealWorld.  They all have Advisors

37

contracts. [Another officer] and I need to go through them with Coreen [Kraysler] and better understand them." As of January 31, 2023—over one week before Lenk's email to Kay—Netcapital had recognized a combined $1.95 million in revenue from consulting agreements between Netcapital Advisors and HeadFarm, CountSharp, and CupCrew.

196. Kay did not question why Lenk, the principal executive officer of Netcapital Advisors, lacked an understanding of the companies or their agreements with Netcapital Advisors, or why Kraysler, who Kay believed only intersected with Netcapital Advisors in her role as CFO of Netcapital, would be in a position to explain them.

197. Netcapital recognized revenue of $390,000 from the HeadFarm consulting agreement in the quarter ending January 31, 2023, even though the agreement was not executed until February 7, 2023. Kay and Kraysler signed Netcapital's quarterly report on Form 10-Q for the quarter ending January 31, 2023, which was filed on March 16, 2023. The Form 10-Q for the quarter ending January 31, 2023 included the $390,000 in claimed revenue from Netcapital Advisors' consulting agreement with HeadFarm.

198. On April 24, 2023, a HeadFarm email account associated with Individual F, a recent college graduate with whom Fanning was acquainted, was created.

199. On April 25, 2023, the HeadFarm email account associated with Individual F was used to execute HeadFarm's Limited Liability Company Agreement via DocuSign from the Fanning-Kraysler Residence. At the time, Individual F lived and was located in Hawaii. HeadFarm's Limited Liability Company Agreement listed Individual F as HeadFarm's first manager.

200. On April 26, 2023, Fanning sent Kraysler emails with the subjects "Head Farm company description" and "Headfarms business model." The emails contained content similar to what was ultimately included on HeadFarm's Funding Portal securities offering page.

38

201.    On May 9, 2023, the HeadFarm email account associated with Individual F was used to execute several documents related to HeadFarm's anticipated Reg. CF securities offering via DocuSign from the Fanning-Kraysler Residence.  Individual F lived and was located in Hawaii at the time.

202.    On June 5, 2023, Riss informed Fanning via Signal that HeadFarm's manager needed to execute a financial statement certification to launch HeadFarm's Reg. CF securities offering.  Minutes later, the HeadFarm email account associated with Individual F was used to execute a certification of HeadFarm's financial statements from the Fanning-Kraysler Residence. Individual F lived and was located in Hawaii at the time.  Less than 25 minutes after Riss first raised the issue, Fanning indicated to Riss that the document had been signed.

203.    Also on June 5, 2023, Kraysler received a capitalization table for HeadFarm, which showed that Intermediary Companies Dotcom Capital, Vaxstar, Stallion Seed, Fanning LLC, Black Eagle Ventures, and Codelaw each owned between 1.18 percent and 15.51 percent of HeadFarm.  Kraysler simultaneously received capitalization tables for Portfolio Companies RealWorld and CountSharp, which also listed those or other Intermediary Companies as owners of RealWorld and CountSharp.

204.    On June 12, 2023, the HeadFarm email account associated with Individual F executed a document appointing another person, Individual G, as a manager of HeadFarm.  The document was countersigned using a HeadFarm email account associated with Individual G. Both signatures were applied using DocuSign from the Fanning-Kraysler Residence.  At the time, Individual F lived and was located in Hawaii, and Individual G was not in Massachusetts.

205.    On June 13, 2023, Riss informed Fanning via Signal that HeadFarm's "valuation [was] $5,864,500."

206.    On June 14, 2023, HeadFarm filed with the Commission a Form C, the official securities offering statement for raising capital under Reg. CF.  HeadFarm purported to be seeking to raise $123,848.70, just under the threshold that would have required independent accountant review of HeadFarm's financial statements.  The Form C purported to be signed by Individual F as principal executive officer, principal financial officer, principal accounting officer, and board member.  Individual F had never agreed to serve in any of those roles.

207.    HeadFarm's securities offering was listed on the Funding Portal that same day, June 14, 2023.

208.    The next day, June 15, 2023, an individual emailed a Netcapital employee: "[Individual F] is a former colleague of mine . . . .  I reached out to her and she has never worked for this HeadFarm company and never agreed to have her name on this raise."  The Netcapital employee forwarded the email to others at Netcapital.

209.    The same day, June 15, 2023, Fanning sent a Signal message to Riss stating that the new HeadFarm manager, Individual G, had "signed the headfarm documents.  He sent a headshot and Bio.  He needs to be added first as Manager on Offering page.  Can you get that fixed?"

210.    On June 16, 2023, Fanning and Riss exchanged additional Signal messages regarding the situation with HeadFarm management.  Fanning asked Riss whether "it g[o]t fixed."  Riss replied, "Yes."  Fanning then responded, "Can we move [Individual F] to third and change her title to advisor and make [Individual G] first."

211.    Around this time, Individual F, having been informed of her purported association with HeadFarm, confronted Fanning about her name, image, and signature being used without her knowledge or consent.

212.    On June 17, 2023, Fanning sent a Signal message to Riss stating that Individual F "needs to be removed completely now.  We need to have [Individual G] sign the financial statements. . . .  You should ask someone to change it today because [Individual F] is mad.  Akso [sic] we need to replace [Individual F's] certification with one from [Individual G]."

213.    Riss replied to Fanning on June 17, 2023 that he was not "sure who is available." Fanning replied, "ok. it could be a problem we want to avoid. . . .  Let me know if we need [Individual G] to certify the financials."

214.    On June 19, 2023, Fanning, recognizing the risk that Individual F could expose the scheme, wrote to Riss on Signal:  "We need to get the financials with [Individual F's] signature taken off and replace [sic] with [Individual G's] or shes [sic] going to make a fuss and its [sic] going to be very bad for us."

215.    In the same June 19, 2023 message to Riss regarding removal of Individual F from HeadFarm's offering page and financial statement certification, Fanning wrote that he had called Kay and that Kay would speak with the Funding Portal's CEO about the issue.

216.    Also on June 19, 2023, Kay wrote to the CEO of the Funding Portal, "we need to take [Individual F] off the Headfarm [sic] page asap . . . apparently she is mad," echoing language Fanning used when describing the issue to Riss.  The next morning, the CEO of the Funding Portal responded to Kay, "This is done."

217.    Fanning, Kay, and Riss knew or recklessly ignored that Individual F, who was listed as HeadFarm's manager and was the purported signatory of numerous HeadFarm documents, had no real involvement with the company.  Despite that, Netcapital had already filed a Form 10-Q, signed by Kay, disclosing that it had recognized hundreds of thousands of dollars in revenue from HeadFarm, as described above.

218. On June 20, 2023, the HeadFarm email account associated with Individual G was used to execute various documents related to HeadFarm's Reg. CF securities offering from the Fanning-Kraysler Residence. Individual G was not in Massachusetts at the time.

219. On July 26, 2023, Netcapital filed with the Commission an annual report on Form 10-K for Netcapital's fiscal year ending April 30, 2023. The Form 10-K reported revenue including $780,000 from the HeadFarm consulting agreement in the quarter ending April 30, 2023. Kay and Kraysler signed the Form 10-K as Netcapital's principal executive and principal financial officers, respectively.

220. In all, Netcapital recognized a total of $1.17 million from the HeadFarm consulting agreement in the fiscal year ending April 30, 2023. Revenue from the HeadFarm consulting agreement accounted for approximately 14 percent of Netcapital's reported revenue during the fiscal year ending April 30, 2023.

221. On June 27, 2023, Lenk emailed Kay a proposed promissory note between Netcapital and HeadFarm, whereby Netcapital would lend HeadFarm $20,000. Lenk wrote: "Given our current cash situation, I don't believe this should be signed. Let me know if you think otherwise." One month later, on July 27, 2023, Kraysler emailed Lenk: "$20,000 HeadFarm . . . Please transfer the above funds once you have the fully executed agreements."

222. On August 1, 2023, Lenk informed Kay in a text message that Fanning "was looking for" certain "fund[s]," including the anticipated $20,000 loan to HeadFarm. The same day, Lenk executed the promissory note on Netcapital's behalf, and Netcapital Advisors transferred $20,000 to a bank account associated with HeadFarm.

223. On August 30, 2023, Kraysler and Kay exchanged emails regarding a draft contract between Netcapital and HeadFarm. Kraylser wrote, "This contract needs to be adjusted.

I will talk to John [Fanning]." Kay replied regarding a potential change to the contract, and Kraysler noted that Fanning agreed with Kay's change.

224.    Kraysler and Kay knew of or recklessly disregarded—and Lenk was negligent regarding—Fanning's control over HeadFarm.

225.    On October 24, 2023, the bank account associated with HeadFarm transferred $20,000—the same amount that Netcapital had loaned HeadFarm in August 2023—to a bank account associated with Intermediary Company Nantascot. The transfer was authorized from the Fanning-Kraysler Residence.

226.    In the fall of 2023, Individual G informed Fanning that he would no longer be associated with HeadFarm. Individual G has had no connection with HeadFarm since that time. Nevertheless, as late as August 2024, the HeadFarm email account associated with Individual G was used to electronically sign various document pertaining to HeadFarm, including financial statement certifications and investment confirmations provided to Netcapital's auditor. The signatures were applied from the Fanning-Kraysler Residence or another location in Massachusetts even though Individual G was not in Massachusetts at the relevant times.

## I.    Netcapital's Quarterly and Annual SEC Filings Misled Investors Regarding the Related-Party Nature of the Portfolio Company Consulting Agreements.

227.    Netcapital's reporting obligations under federal law, as well as under GAAP, required it to disclose information regarding related-party transactions.

228.    Item 404(a) of Regulation S-K requires issuers to disclose any transaction exceeding $120,000 in which the registrant was or is to be a participant and in which any related person had or will have a direct or indirect material interest. The instructions to Item 404(a) define related persons to include any director or executive officer of the registrant, as well as any

43

immediate family member of a director or executive officer of the registrant, which includes spouses.

229.    Pursuant to Accounting Standards Codification Topic 850, Related Party Disclosures ("ASC 850"), related parties are defined as, among other things, "[m]anagement of the entity and members of their immediate families" and "[o]ther parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests."

230.    With respect to related-party transactions, ASC 850 requires disclosure of the nature of the relationship, a description of the transaction, the dollar amount of the transaction, and other matters.

231.    Netcapital's quarterly and annual reports during the Relevant Period disclosed various related-party transactions.  Among other related-party transactions, Netcapital routinely disclosed transactions between Netcapital and one of Fanning and Kraysler's adult children, including transactions between Netcapital and a company that he controlled.

232.    At no point during the Relevant Period did Netcapital disclose that the Portfolio Company revenue derived from related-party transactions involving Fanning.

233.    As a result of those omissions, Netcapital's related-party disclosures were misleading.

234.    Netcapital failed to disclose the Portfolio Company consulting arrangements as related-party transactions notwithstanding that, on the one hand, Fanning controlled the Portfolio Companies and, on the other hand, Fanning acted as an office of Netcapital and was the spouse of Netcapital's CFO.

235.    Kraysler, Riss, and Kay each knew of or recklessly ignored Fanning's role with Netcapital—where he acted as an officer—and his simultaneous control over the Portfolio Companies, which entered transactions with Netcapital purportedly valued at $1 million or more.

236.    Lenk acted negligently in approving Netcapital's quarterly and annual financial reports that failed to disclose that the Portfolio Company consulting revenue derived from related-party transactions involving Fanning.

**J.    Netcapital Raised Money from Investors Based on Fraudulent Financial Statements.**

237.    Between January 2022 and July 2025, Netcapital raised over $25.6 million in public and private securities offerings.

238.    During that same period, Netcapital exchanged stock valued at approximately $3.6 million to acquire assets or services or to repay existing debt.

239.    When raising money from investors, Netcapital's securities offering documents set forth inflated revenue amounts and/or incorporated by reference quarterly and annual Commission filings that included inflated revenue.

240.    Netcapital obtained money from investors and used its stock to acquire assets and repay debt while touting its reported, but fraudulent, revenue.

241.    In a September 12, 2022 press release, Netcapital highlighted its "[r]evenue growth of 114% year-over-year" in the quarter ending July 31, 2022.

242.    In a July 26, 2023 announcement of financial performance for the fiscal year ending April 30, 2023, Netcapital noted "[r]evenue growth of 55% year-over-year," and Kay asserted that "[t]he value proposition of our business is becoming more evident as we continue to build scale."

243.    Fanning, Riss, Kraysler, Kay, and Lenk each obtained money from Netcapital's fraudulent securities offerings based on overstated revenue.  They each received compensation

and other payments—including salaries, bonuses, equity compensation, consulting fees, repayments of purported loans, and/or other payments—from Netcapital. Netcapital likely could not have made those payments absent the fraudulent securities offerings because, during the Relevant Period, the substantial majority of Netcapital's cash was derived from the fraudulent securities offerings rather than Netcapital's operations.

244.    Certain Netcapital public filings linked executive compensation to the successful completion of securities offerings to investors. For example, in a prospectus filed with the Commission on July 13, 2022, Netcapital disclosed that Kraysler's and Lenk's salaries would increase when Netcapital completed an offering of securities valued at approximately $5 million. Similarly, in a proxy statement filed on August 14, 2025, Netcapital disclosed that Kraysler and Kay were awarded bonuses in the fiscal year ending April 30, 2025 in part "in recognition of their roles in . . . executing an equity financing."

K.      **Kraysler, Kay, and Lenk Made False Certifications Under Exchange Act Rule 13a-14.**

245.    Pursuant to Rule 13a-14 under the Exchange Act, Netcapital's quarterly Commission filings on Form 10-Q and its annual filings on Form 10-K included as exhibits separate certifications from Netcapital's principal executive officer and principal financial officer. Those certifications ("Rule 13a-14 Certifications") provide that the certifying officer has reviewed the report and that: (a) based on that person's knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report; (b) based on that person's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations, and cash flows of

46

Netcapital; and (c) that person has disclosed to Netcapital's auditors and the audit committee of Netcapital's board of directors any fraud involving management or other employees with a significant role in Netcapital's internal control over financial reporting.

246. Kraysler was Netcapital's principal financial officer during the entire Relevant Period. She executed Rule 13a-14 Certifications for Netcapital's quarterly and annual reports for each reporting period between the quarter ending October 31, 2021 and the fiscal year ending April 30, 2024.

247. During a portion of the Relevant Period, Lenk was Netcapital's principal executive officer. She executed Rule 13a-14 Certifications for Netcapital's quarterly and annual reports for each reporting period between the quarter ending October 31, 2021 and the quarter ending October 31, 2022.

248. Kay replaced Lenk as Netcapital's principal executive officer in January 2023. Kay executed Rule 13a-14 Certifications for Netcapital's quarterly and annual reports for each reporting period between the quarter ending January 31, 2023 and the fiscal year ending April 30, 2024.

249. Each of the Rule 13a-14 Certifications executed for the reporting periods between the quarter ending October 31, 2021 and the fiscal year ending April 30, 2024 were false.

250. As Kraysler and Kay knew, Netcapital's quarterly and annual reports severely overstated Netcapital's revenue by including revenue from sham agreements between Netcapital Advisors and the Portfolio Companies.

251. As Kraysler and Kay also knew, the quarterly and annual reports also failed to disclose the related-party nature of the Portfolio Company consulting arrangements, which made the statements in the quarterly and annual reports regarding related-party transactions materially misleading.

252.    At no point during the Relevant Period did Kraysler, Kay, or Lenk disclose the fraud to Netcapital's auditor or the audit committee of Netcapital's board.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
**(As to Defendants Netcapital, Fanning, Kraysler, Kay, and Riss)**

253.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

254.    By engaging in the acts and conduct alleged above, Netcapital, Fanning, Kraysler, Kay, and Riss, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly or recklessly has employed one or more devices, schemes, or artifices to defraud, in violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and will continue to violate that section unless enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**
**(As to Defendants Netcapital, Kraysler, Kay, and Lenk)**

255.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

256.    By engaging in the acts and conduct alleged above, Netcapital, Kraysler, Kay, and Lenk directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly, recklessly, or negligently has obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading,

48

in violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and will continue to violate that section unless enjoined.

### THIRD CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]**
**(As to Defendants Netcapital, Fanning, Kraysler, Kay, Riss, and Lenk)**

257.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

258.    By engaging in the acts and conduct alleged above, Netcapital, Fanning, Kraysler, Kay, Riss, and Lenk directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly, recklessly, or negligently has engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser, in violation of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] and will continue to violate that section unless enjoined.

### FOURTH CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. §§ 240.10b-5(a) and (c)]**
**(As to Defendants Netcapital, Fanning, Kraysler, Kay, and Riss)**

259.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

260.    By engaging in the acts and conduct alleged above, Netcapital, Fanning, Kraysler, Kay, and Riss, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud

or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and will continue to violate that section and those rules unless enjoined.

**FIFTH CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(b)]**
**(As to Defendants Netcapital, Kraysler, and Kay)**

261.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

262.    By engaging in the acts and conduct alleged above, Netcapital, Kraysler, and Kay directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsection (b) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)] and will continue to violate that section and rule unless enjoined.

**SIXTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**Aiding and Abetting Netcapital's Violations of Securities Act Section 17(a)(2)**
**(As to Defendants Fanning and Riss)**

263.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

264.    By virtue of the conduct described above, Netcapital knowingly, recklessly, or negligently has obtained money or property by means of untrue statements of a material fact or

50

omissions of a  material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

265.    Fanning and Riss each knowingly or recklessly provided substantial assistance to Netcapital in its violations of Section 17(a)(2) of the Securities Act.  Therefore, Fanning and Riss are both liable pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] for aiding and abetting Netcapital's violations of Section 17(a)(2) of the Securities Act and will continue to aid and abet these violations unless enjoined.

**SEVENTH CLAIM FOR RELIEF**
**<u>AIDING AND ABETTING</u>**
**Aiding and Abetting Netcapital's Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**
**(As to Defendants Fanning and Riss)**

266.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

267.    By virtue of the conduct described above, Netcapital made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsection (b) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

268.    Fanning and Riss each knowingly or recklessly provided substantial assistance to Netcapital in its violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder. Therefore, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Fanning and Riss are both liable for aiding and abetting Netcapital's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and will continue to aid and abet these violations unless enjoined.

**EIGHTH CLAIM FOR RELIEF**
**FALSE AND MISLEADING SEC FILINGS**
Violation of Section 13(a) of the Exchange Act and
Rules 12b-20, 13a-1, and 13a-13 Under the Exchange Act
[15 U.S.C. § 78m(a), 17 C.F.R. §§ 240.12b-20, 13a-1, and 13a-13]
(As to Netcapital)

269. The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

270. During the Relevant Period, as set forth above, Netcapital reported fraudulently overstated revenue in public filings with the Commission for ten consecutive fiscal quarters.

271. During the Relevant Period, as set forth above, Netcapital failed to disclose related-party transactions between Netcapital and the Portfolio Companies.

272. During the Relevant Period, as alleged above, Netcapital was an issuer of securities registered pursuant to Section 12 of the Exchange Act. Netcapital filed with the Commission annual reports on Form 10-K and quarterly reports on Forms 10-Q that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 [17 C.F.R. §§ 240.13a-1, and 13a-13]. Netcapital's annual reports on Form 10-K and quarterly reports on Form 10-Q failed, in addition to the information expressly required to be included in those reports, to add such further material information necessary to make the required statements, in the light of the circumstances under which they were made not misleading, in violation of Rule 12b-20 under the Exchange Act [17 C.F.R. § 240.12b-20].

273. By engaging in the conduct described above, Netcapital violated, and unless restrained and enjoined will again violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 under the Exchange Act.

**NINTH CLAIM FOR RELIEF**
**<u>FALSE CERTIFICATIONS</u>**
**Violation of Rule 13a-14 of the Exchange Act**
**[17 C.F.R. § 240.13a-14]**
**(As to Kraysler, Kay, and Lenk)**

274.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

275.    Kraysler as Netcapital's CFO, Lenk during her tenure as Netcapital's CEO, and Kay during his tenure as Netcapital's CEO, signed certifications required by Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] for Netcapital's annual reports on Form 10-K and quarterly reports on Form 10-Q for the Relevant Period.

276.    Kraysler and Kay both falsely certified that, based on their knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the respective reports.

277.    Kraysler and Kay both falsely certified that, based on their knowledge, the financial statements, and other financial information included in the reports, fairly presented in all material respects the financial condition, results of operations and cash flows of Netcapital as of, and for, the periods present in the respective reports.

278.    Kraysler, Kay, and Lenk each falsely certified that they had disclosed, based on the most recent evaluation of internal control over financial reporting, to Netcapital's auditors and the audit committee of its board of directors, any fraud, whether or not material, that involved management or other employees who had a significant role in Netcapital's internal control over financial reporting.

279.    By engaging in the conduct described above, Kraysler, Kay, and Lenk violated, and unless restrained and enjoined will likely again violate, Rule 13a-14 of the Exchange Act.

**TENTH CLAIM FOR RELIEF**
**MISREPRESENTATIONS IN CONNECTION WITH THE**
**PREPARATION OF REQUIRED REPORTS AND DOCUMENTS**
**Violation of Rule 13b2-2 of the Exchange Act**
**[17 C.F.R. § 240.13b2-2]**
**(As to Kraysler and Kay)**

280.    The Commission realleges and incorporates by reference paragraphs 1 through 252 as if fully set forth herein.

281.    Kraysler and Kay executed management representation letters provided to Netcapital's auditor, which falsely "confirm" in relevant part that: (a) Netcapital's financials conform with GAAP; (b) the signers did not know of or suspect fraud; (c) revenue from customer contracts was appropriately accounted for under standards governing recognition of revenue from contracts with customers; and (d) revenue-generating contracts had commercial substance and were approved by appropriate parties.

282.    Kraysler and Kay thus made materially false or misleading statements to an accountant in connection with an audit, review, or examination of the financial statements of Netcapital.

283.    By engaging in the conduct described above, Kraysler and Kay violated, and unless restrained and enjoined will again violate, Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.    Permanently enjoining Defendants, and each of their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating,

54

directly or indirectly, the federal securities laws and rules this Complaint alleges they have violated.

B.      Prohibiting each of Fanning, Kraysler, Kay, Riss, and Lenk from directly or indirectly, including, but not limited to, through any entity each respectively owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent any of them from purchasing or selling securities for his or her own account.

C.      Prohibiting each of Fanning, Kraysler, Riss, and Kay from directly or indirectly acting as or being associated with any broker or dealer.

D.      Prohibiting Fanning from directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the management of, exercising control over, or influencing Netcapital, aside from voting, purchasing, or selling shares of Netcapital or its successors on his own behalf.

E.      Prohibiting Riss from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit.

F.      Prohibiting Fanning, Kraysler, Kay, and Riss from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

G.      Ordering Fanning, Kraysler, Kay, Riss, and Netcapital to disgorge all ill-gotten gains they received, directly or indirectly, with prejudgment interest thereon, as a result of the

alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

H.    Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

I.    Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

J.    Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action of all issues so triable under the claims in this Complaint.

Dated: August 10, 2026                SECURITIES AND EXCHANGE COMMISSION,
                                      By its attorneys,

                                      /s *Michael C. Moran*
                                      Michael C. Moran (Mass. Bar No. 666885)
                                      Ivan Panchenko (Mass. Bar No. 693552)
                                      Boston Regional Office
                                      33 Arch Street, 24th Floor
                                      Boston, MA  02110
                                      Phone:  (617) 573-8900
                                      Moran email:  MoranMi@sec.gov
                                      Moran phone: (617) 573-8931
                                      Panchenko email: PanchenkoIv@sec.gov
                                      Panchenko phone: (617) 573-8992